Good morning, Your Honor. Deanna Dotson representing the appellant, Mr. Sappa. Since this case really revolves around whether or not there was probable cause to issue the search warrant, I'd like to go through the circumstances and the timeline of which surrounds the one sentence in this 24-page affidavit that refers to Mr. Sappa. If you want to look at the excerpts of record, it starts on page 41 concerning Mr. Sappa, and that's just one sentence. It talks about a telephone call with Mr. Ooty. Now, Mr. Ooty had been Which translation are you going by? Pardon? Which translation of that phone call? I'm just looking at what's in the affidavit right now. I'll talk about the translation of the phone call a little later. Right now, I'm just looking at the actual, in the affidavit, what is stated, because that is F and G. Correct. Because that is the basis for the probable cause for the search warrant, that sentence. The other sentence that refers to him just is identification of the phone number. Okay. That phone call was at 255 p.m. on April 20th. The next sequence of events all take place on April 20th. In this phone call, the affiant alleges that he believes that Wait a minute. Now I'm losing this. Okay. The time of this phone call is 255 on the 20th of April. Okay. Now, the affiant puts in his little beliefs, not the actual evidence of the phone call, but he believes that UT is telling SAPA to put an envelope in a bush, okay, and that this is the money for the drug buy. But just to be fair, if we're going to go on what's presented to the magistrate judge, the prior paragraph talks about a call, UT and Atapui, about a deal about to go down. Correct. That's on the 19th. That's correct. However, you need to look at, we need to look at the sequence of events to make sure that this belief, this inference or speculation on the part of the affiant is plausible, is even correct. Okay. So that's why I think it's important, because it all took place on the 20th. Okay. That's 255. The next entry is where UT, there's no time, but we're following along the sequence of the dates. He says he's observed. He goes to meet this Hispanic male at the shopping center. Okay. He's under surveillance. They're following UT, correct? They're also listening to his phone calls, because the phone call between Sapa and UT was on one of those wiretaps. Now, they notice that the Hispanic male gets out of his car, because he had picked him up, gets out of the car with a shopping bag. So they have other agents that are following the Hispanic male, but now the agents are still following under surveillance of UT. They follow him home. When he reaches his home, they do a traffic stop, and they search him, thinking he has drugs, thinking that's maybe where the drug, you know, he handed him the money, and he got the drugs somehow. There was nothing there. Okay. Now, the next is that UT leaves his house, but that's at 6.45 p.m. He's still under surveillance, because it says he was followed. All right. So, meanwhile, the telephone call with Mr. Sapa, they believe he's going to bring money there and drop it off, all right? Meanwhile, they're watching UT. They're following home. They're watching him this whole time. If Sapa did deliver money for this drug buy, UT would have had to have picked up that money somehow, or Sapa would have had to come to the house at some point during this surveillance. There's no mention that they see Sapa. There's no mention they see UT go and search in the bushes or carry anything, you know, look for anything, or there's anything there. Again, he's under surveillance. He leaves now at this 6.45. He leaves, and then there's a process. There are several entries that talk about phone calls. They're still following the Hispanic male. He loses them, but they catch up with him again. They go to this mall. Then you go down to page 40, excess of record 44, and we get into where UT calls this Priado, and there's a meeting at this parking lot where all these telephone calls are taking place, where the Hispanic male is showing up. UT is there, and he's under surveillance all this time, and they're also watching the Hispanic male. And they see Priado drive into this same parking lot at this club, I don't remember the name of the club, Club Rock. They're all watching him at this time, and the telephone call is going back and forth. This is all on the 20th still. UT receives a call from Priado saying, I guess you can go, and then he receives a call from the Hispanic male saying everything's good. We're under T and U paragraphs. And then under V, at 1145, UT is observed leaving the parking lot, which would lead you to believe the drug bus went, I mean, the drug transfers went down, they got their money, he got, whoever, Priado got the drugs, UT was there kind of watching, supervising, okay, go home. At 12, Priado was observed leaving. Okay, he was also followed. He was followed home. April 22nd, the agents arrest the Hispanic male that had been in contact with UT, and another person, and they seize $10,000 in cash, which meant sometime during this sequence of events, that money had to have passed hands, and the drugs passed hands, just based on the conversation. Now, this is all in the affidavit. So where does Mr. Sapa fit in? When did he supposedly leave this money? There was no way that he could have left that money during that time span, that short, less than four hours of the time of the telephone call, the time that Mr. Ute returned home and was under surveillance. There was no time span. When did he leave it? How did Mr. Ute get the money that was noticeable? So you're, just to distill this down, it's your position that the affidavit on his face shows that UT was under constant surveillance, and not withstanding a phone call, there was no evidence that Sapa ever went to UT's house. Put anything in the bushes, in that cell, from the face of the affidavit? Correct, Your Honor. I mean, you have to have probable cause must be within the four corners of this affidavit for the search warrant. Also, you have to show where the items that they wanted to search for is also probable causes contained, that they're going to be found in Mr. Ute's house, and not in the money. But yet, if you look on the list of, what are there, eight categories of things, there's no mention in here that gives any probable cause to search Mr. Sapa's home for those items. There's not even probable cause to search his home, period, based on this phone call. And then if you look at the phone call, and that was argued in the lower court, it was a phone call in part Samoan and part English. And there is no mention of what the conversation really, what transpired. There were no code words that they could say, we identified this code word. In other paragraphs in the affidavit here, they do mention words that were spoken, like, I guess you can go, and everything's okay. They mention words. But there was no mention about Mr. Sapa, about what was said in this conversation. It's a very innocent conversation. They were talking about a funeral. They were talking about going, you know, welcome over to my house. Even dropping off the package, it was like... Pardon? Clifford Hunt was defense counsel at that time. Correct, Your Honor. Okay, so looking at the, or at least in my pagination, ER2, where they shift, where they get into the discussion, it's numbered, well, on this decision, Uti, you know, if you go to my house, there's a tree or bush in front of my house, and then Sapa is quoted the same time. And Uti says, just put it in there. Okay, there's only one 2C. Uti, yes, if you come, and there is no one here, Sapa, okay, if not, I'll just call you tomorrow. All of that sounds conditional. Then I go to the translation that the defense counsel put in, and that interchange is translated a little more specifically. And it says, without all of these identifiers, your, it says, got some running around to do, ah, okay, your, just remember that when you go to my house, there is a tree or plants in front of my house. Ah, go and put it inside there. Okay, okay, there is only one envelope or package. If you go there and nobody is there, okay, if not, I'll just call you tomorrow. Okay. That eliminates, to my reading, some of the conditionality. Sounds like it was prearranged that he was, in fact, understood to be delivering something. What does one make out of that? It seems to me that the translation that the defense counsel put in was less favorable to your client than what the government put in. Well, not necessarily because they're talking about, um, a funeral. They're talking about going to a funeral on the page previous to that. Correct. I know why these were put in, to talk about funeral, but I was struck by the removal of the conditional ifs. Well, if, I don't have a better translation and I don't speak so well either, and I have to go on what's here because that's in the record. The thing is, though, um, they were talking about going to a funeral and he said he wasn't sure whether he was going to go or not that night or there was a mass and he wasn't really sure where it was. I didn't read the whole transcript. I was just trying to understand which translation you were advocating for. Um, I believe that you need to go on what the true translation is. And even though... Yes, because if he's not sure he's going... I'm sorry. It's fine. It's not your fault. I carried you beyond. So I'll give you a minute to rebut, but... Okay, I have... You're negative two and a half. Oh, I'm sorry. May it please the Court, good morning. I'm Tom Mealick for the United States. Our position is simply, Your Honor, that the district court's finding that the search warrant was supported by probable cause is correct. And at the hearing, the motion to suppress, we agreed that there was a limited portion of Agent Rutherman's affidavit in support of the motion or the application for search warrant where Mr. Sapa, the defendant's mentioned, is limited. That is the one paragraph other than the paragraph that identifies how they came about identifying his house through the GTE telephone records, I believe. Was it true that Udi's house was under surveillance all of this time? No. And I believe we covered that at the argument. I believe I stipulated that Udi was under surveillance that day on the 20th for a good portion of the day by agents, and he was stopped at pulling into his driveway, I believe, and I believe I stipulated to that or agreed to that, but that he was not under surveillance the entire time period, and that... Was the house not Udi? Was his house under surveillance? No, Your Honor. No, his house was not under surveillance. They were following him. He was, interestingly enough, he had been accepted as a Federal prison guard at the Federal Detention Center. They followed him to the Federal Detention Center that day. They followed him to Ala Moana Shopping Center that day. They followed him where he went. They saw his various meetings. They were following Udi, not his house, because he was supposed to meet with people. And, in fact, he did meet with people. It turned out to be Mr. Sepulveda. And was there any, there's nothing in the affidavit the counsel went through to suggest that Udi, under observation, never went to the portion? That's correct. That's correct, Your Honor. There's nothing in that affidavit. But there's, and I think the court, the district court handled that more in the issue of whether a Franks hearing was required, whether the magistrate had been misled by Agent Rutherman's interpretation of the call and where he had, or where the agents had been that day, because Mr. Hunt, the defense attorney, indicated or argued that there's nothing in to show that they wanted to ask Rutherman and Mr. Hunt wanted to ask Rutherman if Sapa had been under surveillance at all. And we stipulated. We said at the hearing Mr. Sapa had not been under surveillance. And the judge said, well, even if he had been or if the judge had known that, it didn't seem to her that it would make a difference whether the warrant was sufficient or if there had been any misapprehension or intentional misleading or negligence on the part of Agent Rutherman in presenting the information to the magistrate. So let's just look at the – there was all that you had on Sapa was Udi calls him and they have a conversation, and Udi tells him to drop a tutti or whatever they call it at his place. And if he didn't find him home, they'd do something later. And they talk about a barbecue and they talk about a funeral. Now, that's very difficult to find probable cause there without someone having followed Sapa or surveilled Udi's house and found that Sapa came and dropped something off. That's the thinnest probable cause that I have seen in a long time. We would offer, Your Honor, and our argument was that based on this phone call, in comparison or in context with what was going on, and Judge Mulway said, you know, if somebody wanted just to leave an envelope, why would they hide it in the bushes? Why wouldn't they put it in the – Nobody's not there. I'm sorry, Your Honor? Why would they put 10 grand in an envelope and leave it outside the house? Well, they wanted to get it to him because if – The problem is you're doing all of this, but I'm thinking if I'm sitting as a magistrate judge and I'm looking at what's being presented to me, one of the at least arguable explanations isn't even adverted to. You can debate whether or not to go through the mental process, but the magistrate judge was never even given the opportunity to do that. This was not an extensive conversation, so I do not understand the rationale of excluding the funeral aspect. Judge Mulway recognized that there is, in fact, a husband in the community presenting envelopes of money to him. Of course, he – but he was – he – I thought Judge Mulway indicated that, from the record, she understood that there was no need to leave the envelope for Udi because Sapa was going to the funeral himself, that why would he leave – That's a debate that is being engaged in after the fact, but the magistrate judge was given a snippet about an individual from which triggered the search of his house and the arrest of his person. And – The warrants were issued based only on that little snippet. Well, I – Isn't that right? No, I disagree with that. I think based – well, based upon – As to him. Yes, as to him. But based upon the entire picture and the totality of the circumstances Without doubt, there was a ton of evidence about everybody else and Udi and everything. And so on the face of it, what was presented was a snippet. But because it was a snippet, it seems all the more crucial to give full context for the magistrate judge to understand what that snippet talked about. It wasn't just – it was never about drugs. Well, it – It is debatable what it was about, and part of the debate was left off the table because it wasn't put in before any judicial officer until and after the fact hearing. Well, that's true. It did not come before the magistrate. But it came after Mr. Adepua had been asked to stand in as a bodyguard the day before. It came in – it came in – that conversation came in just prior to the surveillance of Udi where he met with Mr. Sepulveda. Mr. Sepulveda left Udi's vehicle carrying a shopping bag that he didn't have when he went into the vehicle. There was counter-surveillance that day. I agree. And we stipulated that there was one short paragraph about Sapa's conversation. But a magistrate judge, this Court has held, is allowed to draw reasonable inferences based upon what he's told. Yes, exactly. Yes. And that's the point. What he wasn't told was that there was another arguably material part of the conversation that might have colored his view as to whether the agents had presented enough to justify intrusion on Sapa as opposed to anybody else. I agree. That was in there. And I can only submit on the Court's – No, I understand. All right. That's why – that's the troublesome aspect. Does the Court have any questions for me? I think my brief lays out the rest of my argument. Thank you. Thank you. Thank you, Ron. I know I've gone way over. I'd just like to make one point that you asked a question about leaving an envelope. Well, Mr. Uti lived in an apartment building, which means that you wouldn't just go leave something on the front porch probably because there may not be a front porch in an apartment building. There's quite a lot of drinking water, ceiling washing machines, what-has-not,  pollutants and cleaners have a doorway. But, again, he was under surveillance. The time of the phone call, we don't know the time that he was under surveillance. All right. I think we understand. Your Honor, there was no probable cause to support not only the search warrant or the arrest warrant, and so we're asking that the motion be suppressed. All right. Thank you, counsel. Thank you both for your arguments. Case argued as submitted.
judges: Goodwin, B. Fletcher, Fisher